Richard D. Elley (028245)
**Elley Law PLC**
3323 E. Baseline Rd.
Gilbert, Arizona 85234
(480) 788-4529
rich@elleylaw.com

W. Terry Scannell (OSB 85322)
**Scannellaw, LLC**
7128 SW Gonzaga Street, #220
Portland, OR 97223
503.776.0806
terry@scannellaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph and Carla Thuney, a married couple, <br><br> Plaintiffs, <br> v. <br><br> Lawyer's Title of Arizona, Inc., an Arizona corporation; Julie-Anne Helms, an individual; Helms & Helms, PLLC, an Arizona professional limited liability company; KeyBank, N.A., a national banking association; JP Moran Chase, N.A., a national banking association, <br><br> Defendants. | Case No. CV18-01513-PHX-DJH <br><br> **FIRST AMENDED COMPLAINT** <br><br> **(Jury Trial Demand)** <br><br> **(Assigned the Honorable Diane J. Humetewa)** |

The Plaintiffs allege as follows:

## INTRODUCTION

1. Plaintiffs Thuney are a married couple that saved up enough money to buy a retirement home in Surprise, Arizona.

2. The Thuneys arranged to put $119,555.73 down on a property they were buying.

3. During the transaction, the unencrypted email account of the escrow company, Defendant Lawyers Title ("Lawyers") and/or the unencrypted email account of the real estate agent Julie-Ann Helms ("Helms") were compromised. This is despite the fact that as early as 2015 the dangers of using unencrypted

1

email in real estate transactions like this one was well known and publicized within the real estate industry.

4. Because of Lawyers and Helms negligence, a forged email was used that appeared to be from Lawyers escrow account, that instructed KeyBank to transfer the money not to Lawyers but to a Chase bank Account controlled by individuals or entities conducting the fraudulent and criminal enterprise.

5. Joe Thuney proceed with the transfer of funds in reliance on the email sent to him from what appeared to be a Lawyers Title employee.

6. Joe Thuney in turn electronically forwarded this forged email using his computer to KeyBank.

7. After several missed opportunities to detect the fraud by KeyBank, it transferred the funds from a KeyBank account held by Carla Thuney to what was thought to be Lawyers Title in Arizona.

8. Instead, the money was sent to a JP Morgan Chase account located in Houston, Texas.

9. Within five hours of the transfer, Joe Thuney suspected something was amiss and alerted KeyBank, Helms, Lawyers Title, and JP Morgan Chase of the fraud.

10. All of the participants in the transaction had actual knowledge of the fraud within 7.5 hours of the payment request being made to Chase.

11. Instead of the financial institutions freezing or retrieving the funds for the Plaintiffs, the bank Defendants engaged in a series of acts and omissions that led to JP Morgan Chase releasing funds it knew had been transferred to it as part of a criminal scheme to its "customer" who had perpetrated the fraud.

## JURISDICTION & VENUE

**A.     Jurisdiction**

12. This Court has original jurisdiction based on diversity, pursuant to 28 U.S.C. § 1338 because the action involves a controversy between citizens of different states and the amount in controversy exceeds $75,000, exclusive of

interest and costs.  This Court also has jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

**B.** **Venue**

13. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in this district. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because the Defendants each conduct substantial business in this District, or have sufficient minimum contacts with this District, and otherwise purposely avail themselves of the markets in this District through the promotion, sale, and marketing of their products and services in this District.  In addition, the real property that is the subject of the case is also located in the district.

## FACTS COMMON TO ALL CLAIMS

**A.** **Parties**

14. The Plaintiffs are a married couple who are residents of Clark County, Washington and are both citizens of the State of Washington.  While the KeyBank account at issue in this Complaint is held in the name of Carla Thuney, it is the community property of both Plaintiffs.

15. Lawyers Title of Arizona Inc., ("Lawyers") is an Arizona corporation.  A corporation is a citizen of any state where it is incorporated and of the state where it has its principal place of business. 28 U.S.C. § 1332(c); *see Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990). Lawyers is incorporated in Arizona and has its principal place of business in Arizona.  For the purposes of diversity it is a citizen of the State of Arizona.

16. Julie-Anne Helms (hereinafter "J. Helms") is an individual residing in Maricopa County, Arizona.  J. Helms is a Re/Max Preferred real estate agent.  J. Helms assisted the Thuneys in finding, placing an offer on, and attempting to purchase the property involved in the transaction at issue. Julie-Anne Helms is a Citizen of the State of Arizona.

3

17. Helms & Helms, PLLC (hereinafter "Helms") is an Arizona Professional Limited Liability Company run by Julie-Anne and Mark Helms. Helms holds themselves out as "partners in life and partners in business." Helms is the company through which Defendant Julie-Anne Helms runs her real estate business as a contractor for the ReMax Real Estate company. Helms & Helms, PLLC is a Citizen of the State of Arizona.

18. Defendant JP Morgan Chase Bank, NA ("Chase") is a National Banking Association with its principle place of business in Ohio. For the purposes of diversity, it is a citizen of the State of Ohio.

19. Defendant KeyBank NA ("KeyBank") is a National Banking Association that also has its principle place a business in Ohio. For the purposes of diversity, it is a citizen of the State of Ohio.

**B.  Background Facts**

20. In approximately 2016, the Thuneys decided to invest in a second home in Arizona for the sake of Carla's health and to have her be in a better climate during the winter.

21. The Thuneys hired a real estate agent in Arizona, Defendant Helms, to find a suitable home for them to assist them with the purchase.

22. On or about April 2017, the Thuneys entered into an offer for the real property commonly known as 15132 W. Ventura St., Surprise, AZ 85379.

23. On or about April 27, 2017, the sellers accepted this offer.

24. The Thuneys signed and executed an agreement pertaining to the purchase of the home on W. Ventura St. on or about May 9, 2017.

25. On or about May 9, 2017 at 4:43 PM, Helms sent an unencrypted email with a copy of the Executed Contract for the property to Joe Thuney and advised him that the file had been sent to Lawyers to establish an escrow account and that Amanda Zalenski would be contacting them by phone.

26. On or about May 10, 2017 at 8:13 AM, the Thuneys received an unencrypted email from Amanda Zalenski at Lawyers with instructions for sending their $2,000 earnest money deposit.

27. On or about May 10, 2017, the Thuneys, using a computer, sent the instructions received from Lawyers to KeyBank that in turn arranged for the payment of $2,000 earnest money to the account they were directed to by Amanda Zalenski at Lawyers. The Thuneys did not come into the offices of KeyBank.

28. On or about May 11, 2017 at 7:41 AM, Lawyers, through its agent Amanda Zalenski, sent an unencrypted email to the Thuneys, copying Helms and Judy Meyer of Lawyers. The package contained an introductory packet with the Thuneys' escrow number and applicable documentations. At 8:45 AM she sent an unencrypted email confirming receipt of the first earnest money deposit.

29. On or about May 11, 2017 at 8:26 PM, Helms sent an unencrypted email to the Thuneys with an Earnest Deposit Receipt from Lawyers, a Seller Disclosure statement, and instructions on the home inspection.

30. On or about May 15, 2017 at 2:05 PM, Amanda Zalenski of Lawyers sent an unencrypted email to the Thuneys which contained Lawyers Commitment for Title Insurance and the Schedule B Exception.

31. On or about May 16, 2017 at 10:24 AM, Joe Thuney received an unencrypted email from Chicago Lawyers Insurance Services, Inc., an affiliate of Lawyers, with a quote on homeowner's insurance.

32. On or about May 31, 2017 at 9:00 AM, Joe Thuney received an email purported to be from Amanda Zalenski of Lawyers stating that the Thuneys loan had been funded and that they were set to close on the 9th of June. The email appeared to be from Amanda Zalenski of Lawyers who the Plaintiffs had previously engaged in the prior escrow transaction with. This email included a signature line, logos, images, and other trade dress indicating it was from Lawyers. In fact, this was a forged electronic document making it appear it was from Lawyers when it was not.

5

33. The email also included a forged combined settlement statement and a letter apparently on Lawyers Title's letterhead showing the exact amount due at closing of $119,555.73 and the specific branch of Chase to make the wire transfer to.

34. The amount of $119,555.73 given in the email described in paragraphs 10 through 23 showed the exact new down payment amount that had been agreed to only 20 days before.

35. On or about May 31, 2017 at 9:08 AM, the Thuneys received another forged email telling them that the loan had been funded and asking that Joe Thuney call Lawyers to inform them once the transfer of funds was complete so the title could be filed for closing.

36. On or about May 31, 2017 at 11:38 AM, using his computer, Joe Thuney sent the forged payment instructions to KeyBank. Joe Thuney's purpose in sending this email was to make a payment to Lawyers.

37. On or about a time currently unknown to the Plaintiffs, KeyBank attempted to make the payment to Lawyers Title. The transfer did not go through.

38. On or about Friday, June 2, 2017 at 8:10 AM, the Thuneys received another forged email from the person impersonating Amanda Zalenski stating that Lawyers had not yet received the wire transfer. Joe Thuney responded at 8:43 AM that he would check with KeyBank to see why it had not been completed. Thuney received an email back at 8:46 AM from the person impersonating Zalenski at Lawyers confirming.

39. On or about June 2, 2017 at 10:59 AM, the fraudulent Amanda Zalenski sent a forged and updated set of wiring instructions for the closing funds. This forged email again had the look, feel, and trade dress of a document from Lawyers.

40. On or about June 2, 2017 at 11:03 AM, using his computer, Joe Thuney sent an email to KeyBank containing the updated forged wiring instructions. The Thuneys did not come into KeyBank to arrange this wire.

6

41.     At some point after 11:03 AM KeyBank called the phone number on the instructions and spoke to the fraudulent Amanda Zalenski to confirm the correct account numbers to send the transfer to.  KeyBank's agent stated that he was "hung up on" when he called the number and commented that the person he did eventually speak with talked with a "very heavy accent" and that the phone connection was very poor. Despite these facts, the KeyBank agent did not detect the fact that he was not dealing with Lawyers Title but was in fact talking to a participant in the fraud.

42.     After the weekend, on or about Monday, June 5, 2017 at 9:53 AM, the Thuneys received confirmation from the fraudulent Amanda Zalenski that the wire transfer of $119,555.73 had gone through, and attached a Receipt for Deposit that appeared to be from Lawyers Title.  This time, Joe Thuney noticed that the email addresses were slightly different and called the number on the fake wire instructions.   Joe Thuney called the fraudulent Amanda Zalenski, but there was no answer.

43.     On or about June 5, 2017 at approximately 3:00 PM, Joe Thuney called Helms after looking at the emails and becoming suspicious that something might be wrong.

44.     Six minutes later, on or about June 5, 2017 at 3:36 PM, Joe Thuney emailed Helms a copy of the fraudulent Receipt for Deposit, and told the agent that he thought there might be a fraud.

45.     On or about June 5, 2017 at 3:50 PM, Joe Thuney received an email from the fraudulent Amanda Zalenski stating that she had missed his call due to being in a "board meeting" and that they did not need to appear in person to sign the closing documents.

46.     On or about June 5, 2017 at 3:53 PM, Joe Thuney forwarded the email referenced in paragraph 35 to Helms to see if it was legitimate.

47.     Fifty-seven (57) minutes after Joe Thuney started to suspect that there had been a fraud on June 5, 2017, and at 3:57 PM, only hours after the

Elley Law PLC
3323 E. Baseline Rd.
Gilbert, Arizona 85234

money transaction, Joe Thuney emailed KeyBank stating that there was a potential problem and that they needed to cancel the wire transfer ASAP. It was at this point that KeyBank had actual notice of the fraudulent transfer.

48.     On or about June 5, 2017, between 3:27 PM and 5:57 PM, Joe Thuney called and emailed Rob Eagar at KeyBank, the real Amanda Zalenski, and Judith Meyer, assistant escrow officer at Lawyers, to try to determine what had occurred and attempt to stop the transaction, informing each of the professionals of the fraudulent activity. Judith Meyers also directed the Thuneys not to use Amanda Zelenski's email because Lawyers thought her mail may have been compromised.

49.     In that call, Lawyers represented that it had contacted its fraud division to put a freeze on the funds at Chase and represented to Joe Thuney that they contacted the FBI too and told the FBI there had been a fraud.

50.     As indicated, by this time KeyBank knew of the fraudulent transfer as well and represented that they had contacted Chase and the FBI.

51.     Chase knew that there was a fraudulent transfer and represented to KeyBank that the money was being held in their wiring department and that the money was there, but would not verify the amount with either KeyBank or Lawyers. The Thuneys were told this by both Lawyers and KeyBank.

52.     Shortly after June 5, 2017, Chase allegedly requested a recall and hold harmless from KeyBank to return the money once Chase's investigation was complete, which could potentially take up to thirty days. The Thuneys were told that KeyBank provided all the information and indemnity agreement to Chase. Chase told Lawyers that they had requested the pertinent information from KeyBank and that they were issuing a debit to release the money at the completion of the investigation.

53.     Chase knew that this information would be transmitted to the Plaintiffs.

54. On or about June 12, 2017, at 7:57 PM, Joe Thuney received a Cure Notice from the sellers of the property for failing to close on the house on June 9, 2017, due to the fraudulent transfer.

55. On or about June 15, 2017, Chase informed Lawyers fraud representative that Chase was going to contact its account holder who had conducted the fraud to receive authorization to release the funds.

56. Eleven days after having received actual notice of the fraud on or about June 19, 2017, the fraud representative from KeyBank confirmed that Chase had released the funds to the individuals or entities who had conducted the fraud. Joe Thuney was also informed that the funds were no longer available.

57. The portion of the transaction described herein and related to KeyBank and Chase is subject to the Federal Electronic Funds Transfer Act.

58. On or about June 28, 2017, Joe Thuney received confirmation from Pacific Office Automation, the technology support for his business email, that there had been no breach of data on his email.

59. On or about July 3, 2017 at 2:28 PM, the Thuneys received notice from Lawyers that their Contract for Purchase had been canceled and that the sellers had been given their $2,000 earnest money deposit. This was done by Lawyers without the approval of the Thuneys because they had "not performed."

60. At no time has Lawyers, Helms, KeyBank, or Chase provided any report or written information to the Plaintiffs about what occurred or even if there had been an investigation of the events described above. Nor did the Defendants agree to make any credit or payment to the Plaintiffs account.

## CLAIMS FOR RELIEF

I. **FIRST CLAIM FOR RELIEF**

**(Breach of a Confidential or Fiduciary Duty as to Defendants Lawyers and Helms)**

61. The preceding paragraphs are hereby incorporated by reference as if set forth in full herein.

## COUNT I AS TO LAWYERS

62. In the transaction described in this Complaint, Lawyers was in part acting as the escrow agent or company.

63. An escrow agent has a fiduciary relation of trust and confidence to the parties to the escrow, in this case to the Plaintiffs.

64. Lawyers breached that duty of trust and confidence as more fully described herein.

65. As a direct and proximate result of that breach the Plaintiffs have been damaged in the amount of $119,555.73 and for $2,000 that Lawyers insisted be paid to the sellers of the house.

66. The Plaintiffs also seek $476,000 in punitive damages, as the breach of the duty by Lawyers was reckless and/or willful. Lawyers had knowledge about the dangers of using unencrypted emails and choose not to take reasonable steps to prevent the misappropriation of the confidential business information of the Plaintiffs.

## COUNT II AS TO HELMS

67. In the transaction described in this Complaint, Helms was acting as the real estate agent for the Plaintiffs.

68. A real estate agent has a fiduciary relation of trust and confidence to their clients, in this case to the Plaintiffs.

69. Helms breached that duty of trust and confidence as more fully described herein.

70. As a direct and proximate result of that breach, the Plaintiffs have been damaged in the amount of $119,555.73 and for $2,000 that Lawyers insisted be paid to the sellers of the house.

71. The Plaintiffs also seek $70,000 in punitive damages, as the breach of the duty by Helms was reckless and or willful. Helms had knowledge about the dangers of using unencrypted emails and choose not to take reasonable steps to

**Elley Law PLC**
3323 E. Baseline Rd.
Gilbert, Arizona 85234

prevent the misappropriation of the confidential business information of the Plaintiffs.

## II. SECOND CLAIM FOR RELIEF

**(Negligence and Gross Negligence Against all Defendants except Chase)**

72. The preceding paragraphs are hereby incorporated by reference as if set forth in full herein.

### COUNT I AS TO LAWYERS

73. Defendant Lawyers owed a duty of care to the Plaintiffs, who are its customers, to use reasonable care in protecting the Plaintiffs from having their private financial information stolen and used to defraud the Plaintiffs. Lawyers failed to use reasonable care in implementing encrypted email systems, by failing to follow or have processes and procedures in place which would protect the Plaintiffs from having their private financial information stolen from Lawyers, by failing to detect the "spoofed" email addresses used by the perpetrators of the fraud, by failing to detect an intrusion into Lawyers email or eSignature systems, by failing to provide effective and specific warnings to its customers about the dangers of escrow fraud, and by failing to meet Lawyers duty of care under ARS §13-2316 as made actionable under ARS § 44-1522 to prevent computer fraud.

74. As a direct and proximate result of Defendants negligence and gross negligence, plaintiffs sustained damages of approximately $119,555.73 plus the loss of $2,000 in earnest money. Plus $476,000 in punitive damages.

### COUNT II AS TO HELMS

75. Defendant Helms owed a duty of care to the Plaintiffs, who are their customers, to use reasonable care in protecting the Plaintiffs from having their private financial information stolen and used to defraud the Plaintiffs. Helms failed to use reasonable care in implementing encrypted email systems, by failing to follow or have processes and procedures in place which would protect the Plaintiffs from having their private financial information stolen from Helms, by failing to detect the "spoofed" email addresses used by the perpetrators of the

Elley Law PLC
3323 E. Baseline Rd.
Gilbert, Arizona 85234

fraud, by failing to detect an intrusion into its email or eSignature systems, by failing to provide effective and specific warnings to its customers about the dangers of escrow fraud, and by failing to meet Helms duty of care under ARS §13-2316 as made actionable under ARS § 44-1522 to prevent computer fraud.

76. As a direct and proximate result of Defendants negligence and gross negligence, plaintiffs sustained damages of approximately $119,555.73 plus the loss of $2,000 in earnest money, plus $70,000 in punitive damages.

## COUNT III AS TO KEYBANK

77. Defendant KeyBank owed a duty of care to the Plaintiffs, who are its customers, to use reasonable care in obtaining, reading, analyzing, verifying and using the wiring instructions and in wiring money from Plaintiffs' Account for purchase of the Property.

78. KeyBank was careless, negligent and/or grossly negligent in several material respects including but not limited to:

   A. Failing to observe that the payment instructions were fabricated;

   B. Failing to observe that the payment instructions were not to Lawyers but to another entity that was not part of the transaction;

   C. Failing to observe that the payment instructions were fabricated once the first transfer did not occur;

   D. Failing to check the email address or phone numbers of the instructions once the first payment did not go through;

   E. Failing to observe that the person KeyBank contacted for the purposes of obtaining the payment instructions was not in fact an employee of Lawyers;

   F. Failing to abide by its own policies and procedures, or to adopt and implement commercially reasonable and commercially accepted security procedures to alert the Plaintiffs about the Fraudulent Transfer;

G. Failing to abide by its own policies and procedures, or to adopt and implement commercially reasonable and commercially accepted security procedures to obtain the verified approval of Plaintiffs, prior to KeyBank facilitating the Fraudulent Transfer;

H. Wiring Plaintiffs' funds to an unknown person for purchase of the Property without Plaintiffs' knowledge or consent;

I. Failing to take reasonable steps to retrieve the money from Chase upon learning that KeyBank had made an error in the payment;

J. Failing to meet its duty of care under ARS § 13-2316 as made actionable under ARS § 44-1522 to prevent computer fraud.

K. Failing in all instances to take all reasonable steps it could have taken to prevent the fraud when it was widely known in the banking industry that the type of fraud described in paragraphs 10 to 48 were wide spread and preventable.

L. Failing to obtain an FBI "kill chain order".

79. As a direct and proximate result of Defendants negligence and gross negligence, plaintiffs sustained damages of approximately $119,555.73 plus the loss of $2,000 in earnest money, plus $70,000 in punitive damages.

## III. THIRD CLAIM FOR RELIEF

**(Aiding and Abetting Against Defendant Chase only)**

80. The preceding paragraphs are hereby incorporated by reference as if set forth in full herein.

81. Individuals or entities currently unknown to the Plaintiffs engaged in the torts of fraud and conversion against the Plaintiffs as more specifically set forth in the paragraphs above.

82. These entities or individuals were, and on information and belief still are, clients/customers of Defendant Chase.

83. On or about June 5, 2017, Chase had actual knowledge that these individuals or entities had engaged in acts of fraud or conversion against the Plaintiffs.

84. Despite having this knowledge, Defendant Chase substantially assisted or encouraged these individuals or entities in achieving their goal of defrauding the Plaintiffs. Chase did this by knowingly and recklessly releasing and processing the misappropriated funds of the Plaintiffs to these individuals or entities. On information and belief, Chase is continuing to conduct business with these same individuals or entities and has not conducted a thorough investigation to stop them. This further allows these individuals or entities to continue to do business with Chase and defraud others.

85. As a direct and proximate result of Chase's acts and omissions as set forth above the Plaintiffs have been damaged in the amount of $119,555.73 and for $2,000 in lost escrow payments.

86. The Plaintiffs also seek $1,000,000 in punitive damages, as the breach of the duty by Chase was reckless and willful. Chase had direct knowledge about the theft in a timely manner so it could have stopped the fraud. Instead it chose not to take reasonable steps to prevent the misappropriation of funds of the Plaintiffs or to take other reasonable steps to investigate and prevent its "customers" from perpetrating the same fraud on others.

### IV. FOURTH CLAIM FOR RELIEF

**(Violation of Electronic Funds Transfer Act as to KeyBank and Chase)**

87. The preceding paragraphs are hereby incorporated by reference as if set forth in full herein.

88. Plaintiffs are both "consumers" as that term is used in 15 U.S.C. § 1693(a)(5) of the Electronic Funds Transfer Act ("EFTA").

89. KeyBank and Chase are both "financial institutions" as that term is used in 15 U.S.C. § 1693(a)(8).

90. Plaintiffs' Account is an "account" as that term is used in 15 U.S.C. § 1693(a)(2).

91. The Fraudulent Transfer is an "unauthorized electronic transfer" as that phrase is used and defined in 15 U.S.C. § 1693(a)(12).

92. KeyBank violated its obligations under the EFTA by failing to provide plaintiffs with the disclosures and notices required under that Act and under Regulation E.

93. KeyBank and Chase violated their obligations under the EFTA by failing to perform a good faith investigation into the Fraudulent Transfer and by failing to provide plaintiffs with the results of the investigation within ten (10) business days in violation of 15 U.S.C. § 1693f(a).

94. KeyBank and Chase violated their obligations under the EFTA by failing to correct the account errors caused by the Fraudulent Transfer in violation of 15 U.S.C. § 1693f(b).

95. KeyBank and Chase unlawfully, recklessly, negligently, and/or willfully denied plaintiffs the protections set forth in Regulation E including, but not limited to, the limitations on consumer liability set forth in 12 C.F.R. § 205.6.

96. Pursuant to 15 U.S.C. § 1693g, Plaintiffs' maximum liability for the Fraudulent Transfer is Fifty Dollars ($50.00).

97. KeyBank and Chase have both refused to credit the amount of $119,555.73 back to the Plaintiffs account plus interest, and as a result of the Fraudulent Transfer that is well in excess of Plaintiffs' maximum liability and which is in violation of 15 U.S.C. § 1693g.

98. As a direct and proximate result of KeyBank and Chase's violations of the EFTA, Plaintiffs have sustained damages in excess of $121,555.77 and KeyBank and Chase are liable to Plaintiffs for the full amount of statutory and actual damages along with their reasonable attorneys' fees and the costs of this litigation, as well as such further relief as may be permitted by law.

## V.     FIFTH CLAIM FOR RELIEF

**(Violation of Arizona's Consumer Fraud Act as to KeyBank and Chase)**

99.     The preceding paragraphs are hereby incorporated by reference as if set forth in full herein.

100.     Plaintiffs have a private right of action under Arizona's Consumer Fraud Act (the "Act"). *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 575-576, 521 P.2d 1119, 1121-1122 (1974).

101.     A.R.S. § 44-1522(A) provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

102.     "The terms of this provision [of the Act] are obviously quite broad and are not subject to restrictive interpretation because the Act is generally to be considered remedial in nature." *See People ex rel. Babbitt v. Green Acres Trust*, 127 Ariz. 160, 164, 618 P.2d 1086, 1090 (Ct. App. 1980).

103.     "'Sale' means any sale, offer for sale, or attempt to sell any merchandise for any consideration, including sales, leases and rentals of any real estate subject to any form of deed restriction imposed as part of a previous sale." A.R.S. § 44-1521(7).

104.     Defendants, as alleged herein, made false promises, misrepresentations, concealed, suppressed, or omitted material facts, with the intent that Plaintiffs reply on their actions or inactions in connection with the sale of real estate.

## COUNT I AS TO KEYBANK

105. Defendant KeyBank concealed, suppressed, or omitted material facts by ignoring the red flags of fraudulent activity, by failing to take the necessary actions to stop the transaction, failing to obtain an FBI "kill chain order," or to take the necessary actions or notify Plaintiffs of their ability to take the action to stop the transaction or otherwise protect Plaintiffs from the known fraud.

106. Defendant KeyBank intended that Plaintiffs rely upon the unlawful practice as is shown by, among other facts detailed herein, that the transaction was completed and KeyBank assisted with the same and that KeyBank permitted the transaction to be completed, and that KeyBank failed to provide Plaintiffs the necessary information to take action to stop the transaction or otherwise protect Plaintiffs from the known fraud.

107. KeyBank knew or should have known of the concealment, suppression, or omitted material fact and acted upon them as they were provided actual notice and should have known of the fraud prior to the actual notice.

108. Plaintiffs were as unaware of the concealment, suppression, or omission of material fact of KeyBank at the time as is shown by the Plaintiffs actions and inactions.

109. KeyBank misrepresentations were material in that had Plaintiffs and other parties would have taken or been able to take additional actions to stop the transaction or otherwise protect Plaintiffs from the known fraud.

110. Plaintiffs did in fact rely on Defendant's the concealment, suppression, or omission of material fact by, among other actions and inactions, not contacting law enforcement directly.

111. As a direct and proximate result of Defendants violation of the Act, plaintiffs sustained damages of approximately $119,555.73 plus the loss of $2,000 in earnest money, plus $70,000 in punitive damages

## COUNT II AS TO CHASE

112. Individuals or entities currently unknown to the Plaintiffs engaged in the torts of fraud and conversion against the Plaintiffs as more specifically set forth in the paragraphs above.

113. These entities or individuals were, and on information and belief still are, clients/customers of Defendant Chase.

114. On or about June 5, 2017, Chase had actual knowledge that these individuals or entities had engaged in acts of fraud or conversion against the Plaintiffs.

115. Despite having this knowledge, Defendant Chase substantially assisted or encouraged these individuals or entities in achieving their goal of defrauding the Plaintiffs. Chase did this by knowingly and recklessly releasing and processing the misappropriated funds of the Plaintiffs to these individuals or entities. On information and belief, Chase is continuing to conduct business with these same individuals or entities and has not conducted a thorough investigation to stop them. This further allows these individuals or entities to continue to do business with Chase and defraud others.

116. Defendant Chase concealed, suppressed, or omitted material facts by taking the actions of inactions detailed in paragraph 115, ignoring the red flags of and actual fraudulent activity, by failing to take the necessary actions to stop the transaction, failing to obtain an FBI "kill chain order," or to take the necessary actions or notify Plaintiffs of their ability to take the action to stop the transaction or otherwise protect Plaintiffs from the known fraud.

117. Defendant Chase intended that Plaintiffs rely upon the unlawful practice as is shown by, among other facts detailed herein, that the transaction was completed, Chase assisted with the same, that Chase permitted the transaction to be completed, and that Chase failed to provide Plaintiffs or other parties the necessary information to take action to stop the transaction or otherwise protect Plaintiffs from the known fraud.

118. Chase knew or should have known of the concealment, suppression, or omitted material fact and acted upon them as they were provided actual notice and should have known or did know of the fraud prior to the actual notice.

119. Plaintiffs were as unaware of the concealment, suppression, or omission of material fact of Chase at the time as is shown by the Plaintiffs actions and inactions.

120. Chase's misrepresentations were material in that had Plaintiffs or other parties would or could have taken additional actions to stop the transaction or otherwise protect Plaintiffs from the known fraud.

121. Plaintiff did in fact rely on Chase's the concealment, suppression, or omission of material fact by, among other actions and inactions, not contacting law enforcement directly.

122. As a direct and proximate result of Chase's violation of the Act, plaintiffs sustained damages of approximately $119,555.73 plus the loss of $2,000 in earnest money.

123. The Plaintiffs also seek $1,000,000 in punitive damages, as the violation of the Act by Chase was reckless and willful. Chase had direct knowledge about the theft in a timely manner so it could have stopped the fraud. Instead it chose not to take reasonable steps to prevent the misappropriation of funds of the Plaintiffs or to take other reasonable steps to investigate and prevent its "customers" from perpetrating the same fraud on others.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for relief as follows on their claims:

A. On their First Claim for Relief, against Lawyers and Helms, for at least $119,555.77 plus any damages proven at trial, statutory and actual, along with punitive damages in the amounts of $476,000 against Lawyers, and $70,000 against Helms and their costs and disbursements for this litigation;

B. On their Second Claim for Relief, against Lawyers, Helms and KeyBank, for Plaintiff's actual damages of $119,555.73 plus punitive damages of $476,000 against Lawyers, $476,000 against KeyBank, and $70,000 against Helms.

C. On their Third Claim for Relief, against Defendant Chase, for Plaintiff's actual damages of $119,555.73, plus punitive damages in the amount of $1,000,000.

D. On their Fourth Claim for Relief, against KeyBank and Chase, for Plaintiff's actual damages of $119,555.73, plus the Plaintiff's attorney fees and costs pursuant to the statute plus punitive damages of $476,000 against KeyBank and $1,000,000 against Chase

E. On their Fifth Claim for Relief, against KeyBank and Chase, for Plaintiff's actual damages of $119,555.73, plus the Plaintiff's attorney fees and costs pursuant to the statute plus punitive damages of $476,000 against KeyBank and $1,000,000 against Chase;

F. On all Plaintiff's Claims for Relief for their attorney fees and all costs on the basis as set forth in this Complaint;

G. On all Plaintiff's Claims for Relief for their costs and disbursements incurred herein;

H. Any other relief the Court deems equitable and just.

## VII. DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

**DATED** this 21st day of May, 2018.

**ELLEY LAW PLC**

By:/s/ Richard D. Elley
Richard D. Elley
*Attorney for Plaintiff*

20