IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph and Carla Thuney, a married couple,<br><br>                                 Plaintiffs,<br><br>   vs.<br><br>Lawyer's Title of Arizona, an Arizona<br>Corporation, et al.,<br><br>                                 Defendants. | No. 2:18-cv-1513-HRH |

O R D E R

<u>JPMorgan Chase Bank, N.A.'s Motion to Dismiss Plaintiffs' Complaint</u>

Defendant JPMorgan Chase Bank, N.A. moves to dismiss plaintiffs' first amended complaint.[1] This motion is opposed.[2] Oral argument has been heard on this motion.

<u>Background</u>

Plaintiffs are Joseph and Carla Thuney. Defendants are Lawyers Title of Arizona, Inc.; Julie-Ann Helms; Helms & Helms, PLLC; KeyBank N.A.; and JPMorgan Chase Bank, N.A.

---

[1]Docket No. 27.

[2]Docket No. 44.

On May 9, 2017, plaintiffs executed an agreement to purchase a retirement home in Surprise, Arizona.[3] On that same day, plaintiffs allege that "Helms sent an unencrypted email with a copy of the Executed Contract for the property to Joe Thuney and advised him that the file had been sent to Lawyers to establish an escrow account and that Amanda Zalenski would be contacting [plaintiffs] by phone."[4] Plaintiffs allege that the next day, May 10, 2017, they "received an unencrypted email from Amanda Zalenski at Lawyers with instructions for sending their $2,000 earnest money deposit."[5] Plaintiffs allege that they then "using a computer, sent the instructions received from Lawyers to KeyBank that in turn arranged for the payment of $2,000 earnest money to the account they were directed to by Amanda Zalenski at Lawyers."[6]

Plaintiffs allege that on May 11, 2017, Zalenski, on behalf of Lawyers, "sent an unencrypted email [which] contained an introductory packet with the Thuneys' escrow number and applicable documentation[]."[7] Plaintiffs allege that on May 15, 2017, Zalenski "sent an unencrypted email to [them] which contained Lawyers Commitment for Title Insurance and the Schedule B Exception."[8]

---

[3]First Amended Complaint at 4, ¶¶ 22, 24, Docket No. 10.

[4]Id. at 4, ¶ 25.

[5]Id. at 5, ¶ 26.

[6]Id. at 5, ¶ 27.

[7]Id. at 5, ¶ 28.

[8]Id. at 5, ¶ 30.

Plaintiffs allege that around 9 a.m. on May 31, 2017, Mr. Thuney received an email that purported to be from Zalenski "stating that the Thuneys['] loan had been funded and that they were set to close on the 9th of June."[9] Plaintiffs allege that "[t]his email included a signature line, logos, images, and other trade dress indicating it was from Lawyers" but that it was actually "a forged electronic document making it appear it was from Lawyers when it was not."[10] Plaintiffs allege that "[t]he email also included a forged combined settlement statement and a letter apparently on Lawyers Title's letterhead showing the exact amount due at closing of $119,555.73 and the specific branch of Chase to make the wire transfer to."[11] That branch is alleged to be "located in Houston, Texas."[12]

Plaintiffs allege that around 9:08 a.m. on May 31, 2017, they "received another forged email telling them that the loan had been funded and asking that Joe Thuney call Lawyers to inform them once the transfer of funds was complete so the title could be filed for closing."[13] Plaintiffs allege that at 11:38 a.m. on May 31, 2017, "using a computer, Joe Thuney sent the forged payment instructions to KeyBank."[14]

---

[9] Id. at 5, ¶ 32.

[10] Id.

[11] Id. at 6, ¶ 33.

[12] Id. at 2, ¶ 8.

[13] Id. at 6, ¶ 35.

[14] Id. at 6, ¶ 36.

Plaintiffs allege that on June 2, 2017, they "received another forged email from the person impersonating Amanda Zalenski stating that Lawyers had not yet received the wire transfer."[15] Later that same morning, plaintiffs allege that "the fraudulent Amanda Zalenski sent a forged email and updated set of wiring instructions for the closing funds. This forged email again had the look, feel, and trade dress of a document from Lawyers."[16] Plaintiffs allege that shortly after receiving this email, "using his computer, Joe Thuney sent an email to KeyBank containing the updated forged wiring instructions."[17]

Plaintiffs allege that after KeyBank got Joe Thuney's email, someone from KeyBank

> called the phone number on the instructions and spoke to the fraudulent Amanda Zalenski to confirm the correct account numbers to send the transfer to. KeyBank's agent stated that he was "hung up on" when he called the number and commented that the person he did eventually speak with talked with a "very heavy accent" and that the phone connection was very poor. Despite these facts, the KeyBank agent did not detect the fact that he was not dealing with Lawyers Title but was in fact talking to a participant in the fraud.[18]

Plaintiffs allege that on June 5, 2017 at 9:53 a.m., they "received confirmation from the fraudulent Amanda Zalenski that the wire transfer of $119,555.73 had gone through" and that attached to the email was "a Receipt for Deposit that appeared to be from Lawyers

---

[15] Id. at 6, ¶ 38.

[16] Id. at 6, ¶ 39.

[17] Id. at 6, ¶ 40.

[18] Id. at 7, ¶ 41.

Title."¹⁹ Plaintiffs allege that "[t]his time, Joe Thuney noticed that the email addresses were slightly different" and thus he "called the number on the fake wire instructions," but there was no answer.²⁰ Plaintiffs allege that they were "becoming suspicious that something might be wrong" and so Joe Thuney called Helms around 3 p.m. on June 5, 2017.²¹ Plaintiffs allege that at 3:36 p.m., Joe Thuney "emailed Helms a copy of the fraudulent Receipt for Deposit" and told her "that he thought there might be a fraud."²²

About 3:50 p.m. on June 5, 2017, plaintiffs allege that "Joe Thuney received an email from the fraudulent Amanda Zalenski stating that she missed his call due to being in a 'board meeting' and that [plaintiffs] did not need to appear in person to sign closing documents."²³ Plaintiffs allege that "at 3:53 PM, Joe Thuney forwarded" this email "to Helms to see if it was legitimate."²⁴

Plaintiffs allege that "at 3:57 PM, only hours after the money transaction, Joe Thuney emailed KeyBank stating that there was a potential problem and that they needed to cancel the wire transfer ASAP."²⁵ Plaintiffs further allege that

---

¹⁹Id. at 7, ¶ 42.

²⁰Id.

²¹Id. at 7, ¶ 43.

²²Id. at 7, ¶ 44.

²³Id. at 7, ¶ 45.

²⁴Id. at 7, ¶ 46.

²⁵Id. at 7-8, ¶ 47.

> [o]n or about June 5, 2017, between 3:27 PM and 5:57 PM, Joe Thuney called and emailed Rob Eagar at KeyBank, the real Amanda Zalenski, and Judith Meyer, assistant escrow officer at Lawyers, to try to determine what had occurred and attempt to stop the transaction, informing each of the professionals of the fraudulent activity. Judith Meyers also directed the Thuneys not to use Amanda Zalenski's email because Lawyers thought her [email] may have been compromised.[26]

Plaintiffs allege that Lawyers "represented that it had contacted its fraud division to put a freeze on the funds at Chase and represented to Joe Thuney that [it] contacted the FBI too and told the FBI there had been a fraud."[27] Plaintiffs further allege that "KeyBank . . . represented that [it] had contacted Chase and the FBI."[28] Plaintiffs thus allege that "Chase knew that there was a fraudulent transfer" and they allege that Chase "represented to KeyBank that the money was being held in their wiring department and that the money was there," although Chase "would not verify the amount with either KeyBank or Lawyers."[29]

Plaintiffs allege that "[s]hortly after June 5, 2017, Chase . . . requested a recall and hold harmless from KeyBank to return the money once Chase's investigation was complete, which could potentially take up to thirty days."[30] Plaintiffs allege that they "were told that KeyBank provided all the information and [an] indemnity agreement to Chase" and that

---

[26]Id. at 8, ¶ 48.

[27]Id. at 8, ¶ 49.

[28]Id. at 8, ¶ 50.

[29]Id. at 8, ¶ 51.

[30]Id. at 8, ¶ 52.

"Chase told Lawyers that they had requested the pertinent information from KeyBank and that they were issuing a debit to release the money at the completion of the investigation."[31]

Plaintiffs allege that on "June 15, 2017, Chase informed Lawyers['] fraud representative that Chase was going to contact its account holder who had conducted the fraud to receive authorization to release the funds."[32] Plaintiffs allege that on June 19, 2017, "the fraud representative from KeyBank confirmed that Chase had released the funds to the individuals or entities who had conducted the fraud."[33]

Plaintiffs allege that on July 3, 2017, they "received notice from Lawyers that their Contract for Purchase had been canceled and that the sellers had been given plaintiffs' $2,000 earnest money deposit."[34] Plaintiffs further allege that they have lost the $119,555.73 that they instructed be wired from KeyBank to Chase, as defendants have not "agree[d] to make any credit or payment" to plaintiffs' account.[35] Plaintiffs allege that "[a]t no time has Lawyers, Helms, KeyBank, or Chase provided any report or written information to [them] about what occurred or even if there had been an investigation" into the fraudulent transfer.[36]

---

[31] Id. at 8, ¶ 52

[32] Id. at 9, ¶ 55.

[33] Id. at 9, ¶ 56.

[34] Id. at 9, ¶ 59.

[35] Id. at 9, ¶ 60.

[36] Id.

Plaintiffs commenced this action on May 18, 2018. In their first amended complaint, they assert three claims against Chase: 1) an aiding and abetting claim, 2) an Electronic Funds Transfer Act (EFTA) claim, and 3) an Arizona Consumer Fraud Act (ACFA) claim.

Pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, Chase now moves to dismiss plaintiffs' claims against it.

Discussion

"'To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Zixiang Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678). "The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully." Id. "'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 678). "[T]he complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" In re Rigel Pharmaceuticals, Inc. Securities Litig., 697 F.3d 869, 875 (9th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual

allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." Adams v. U.S. Forest Srvc., 671 F.3d 1138, 1142-43 (9th Cir. 2012).

In their opposition, plaintiffs "withdraw" their EFTA claim because they "are only seeking redress for what Chase did or did not do, <u>after</u> the funds transfer was completed[.]"[37] Thus, plaintiffs' EFTA claim against Chase is dismissed with prejudice.

Turning then to plaintiffs' aiding and abetting and ACFA claims, Chase first argues that these claims are preempted by Article 4A of the Arizona Uniform Commercial Code. "Fund or wire transfers are governed by Article 4A of the U.C.C." Koss Corp. v. American Exp. Co., 309 P.3d 898, 905 (Ariz. Ct. App. 2013). "Article 4A is 'intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties <u>in any situation covered by particular provisions of the Article</u>.'" Id. (quoting U.C.C. § 4A–102 cmt. (emphasis added)). "'A review of Article 4A demonstrates that it carefully and comprehensively governs the rights and responsibilities between the originator and the originator's bank and between intermediary banks involved in payment orders . . . as well as between a beneficiary's bank and the beneficiary. . . .'" Rock Point School, Inc. v. Wells Fargo Bank, N.A., Case No. CV-15-08057-PCT-SRB, 2015 WL 13123002, at *4 (D. Ariz. Aug. 4, 2015) (quoting Koss, 309 P.3d at 906). "'[T]he actions of the parties involved in a funds transfer that implicate the transaction itself are exclusively governed by Article 4A.'" Id. (quoting Koss, 309 P.3d at 906)); see also, Ma v. Merrill Lynch, Pierce, Fenner & Smith,

---

[37]Plaintiff's [sic] Response to Defendant Chase's Motion to Dismiss at 5, Docket No. 44.

-9-

Inc., 597 F.3d 84, 90 (2nd Cir. 2010) ("Article 4A's text strongly suggests that it applies to claims asserting the existence of unauthorized wire transfers regardless of what the claims may be called").

"[T]he first question is whether Article 4A encompasses the misconduct and claims that [plaintiffs] allege[] in [their] complaint." Koss, 309 P.3d at 905. Chase argues that Article 4A encompasses the misconduct alleged by plaintiffs because their aiding and abetting and ACFA claims center on Chase's purported role in executing the alleged fraudulent wire instructions. Specifically, plaintiffs' aiding and abetting and ACFA claims are based on allegations that Chase "knowingly and recklessly release[d] . . . the misappropriated funds" to the fraudsters.[38] Chase argues that this alleged misconduct, the release of the funds, is directly regulated by Article 4A of the U.C.C. Specifically, Chase contends that the duties and obligations of a beneficiary bank, which is what it was in the transaction at issue, in handling a wire transfer that potentially misdescribes the beneficiary are governed by Section 47-4A-207.

"However, the U.C.C. does not necessarily preempt claims based on additional actions that occur <u>outside</u> the funds transfer process or exceed the allocation of liability under Article 4A provided the application of other law is not inconsistent with Article 4A." Koss, 309 P.3d at 906; see also, Rock Point School, 2015 WL 13123002, at *4 ("Article 4A d[oes] not preempt common law claims based on alleged misconduct occurring after the wire transfer

---

[38]First Amended Complaint at 14, ¶ 84, Docket No. 10.

process was complete"). For purposes of Article 4A, "a funds transfer is completed when the beneficiary's bank accepts 'a payment order for the benefit of the beneficiary of the originator's payment order.'" Koss, 309 P.3d at 906 (quoting A.R.S. § 47–4A104(l )). Plaintiffs' aiding and abetting and ACFA claims are based on conduct by Chase that occurred after the wire transfer was complete, namely, the release of the funds by Chase. Thus, plaintiffs' aiding and abetting and ACFA claims are not preempted by Article 4A of the U.C.C.

But even if plaintiffs' aiding and abetting and ACFA claims are not preempted by Article 4A of the U.C.C., which they are not, Chase argues that these claims should still be dismissed as plaintiffs have failed to state plausible claims. First, as to plaintiffs' aiding and abetting claim, in order to prevail on such a claim, plaintiffs must establish that "(1) the primary tortfeasor [committed] a tort that cause[d] injury to" plaintiffs, (2) Chase knew "that the primary tortfeasor's conduct constitute[d] a breach of duty;" and (3) Chase "substantially assist[ed] or encourage[d] the primary tortfeasor in the achievement of the breach." Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund, 38 P.3d 12, 23 (Ariz. 2002) (citation omitted).

Plaintiffs allege that Chase aided and abetted the fraudsters' commission of fraud and conversion.[39] Chase argues that plaintiffs have failed to plausibly allege an underlying tort of conversion because "money can [only] be the subject of a conversion provided that it can

---

[39]Id. at 14, ¶ 83.

be described, identified or segregated, and [if] an obligation to treat it in a specific manner is established." Autoville, Inc. v. Friedman, 510 P.2d 400, 402 (Ariz. Ct. App. 1973). Chase argues that plaintiffs have not alleged that the money that was transferred to Chase can be described, identified, or segregated.

But even if there were no underlying tort of conversion, that does not necessarily make plaintiffs' aiding and abetting claim implausible because plaintiffs have also alleged that Chase aided and abetted fraud. Chase however argues that plaintiffs' aiding and abetting claim based on fraud is not plausible because plaintiffs cannot plausibly allege that Chase had knowledge of the alleged fraud prior to the transfer. Chase argues that plaintiffs have alleged that Chase learned of the possible fraud after the funds had already been transferred. Chase points out that plaintiffs allege that on June 5, 2017, at 9:53 a.m., Joe Thuney received an email from the fraudulent Zalenski confirming that the wire transfer had gone through and that plaintiffs allege that they contacted KeyBank, which in turn contacted Chase, about the potential fraud around 3:57 p.m.[40] If the funds had already been transferred prior to Chase being made aware of any potential fraud, then Chase argues that plaintiffs cannot plausibly claim that Chase was aware of the alleged fraud.

But, plaintiffs' aiding and abetting claim is not based on what Chase knew prior to the transfer of the funds, but rather on what Chase did after the funds had been transferred. Plaintiffs have plausibly alleged that Chase aided and abetted the fraud by releasing the funds

---

[40]Id. at 7-8, ¶¶ 42, 47.

to the fraudsters and that Chase knew about the alleged fraud before it released the funds to the fraudsters.[41]

Chase next argues that plaintiffs' aiding and abetting claim is not plausible because plaintiffs have not sufficiently alleged that Chase substantially assisted in the alleged fraudulent transfer. "Proof of substantial assistance requires a showing that [Chase's] conduct was 'a substantial factor in causing [plaintiffs'] harm.'" Stern v. Charles Schwab & Co., Case No. CV–09–1229–PHX–DGC, 2009 WL 3352408, at *8 (D. Ariz. Oct. 16, 2009) (quoting In re Am. Cont'l Corp., 794 F. Supp. 1424, 1434–35 (D. Ariz. 1992)). "Processing day-to-day transactions does not constitute substantial assistance unless the bank has an 'extraordinary economic motivation to aid in the fraud.'" Id. (quoting Ariz. Laborers, 38 P.3d at 27). Chase argues that its acceptance of the fraudulent wire instruction and then its release of the funds are day-to-day banking transactions and that plaintiffs have not, and cannot, allege that Chase had an extraordinary economic motivation to aid in the fraudulent transfer. Chase argues that one would be hard pressed to come up with any reason as to why it would knowingly permit persons to use its services to commit fraud. Chase also argues that plaintiffs' allegations that Chase failed to "take . . . reasonable steps to investigate" the fraud after it happened[42] cannot save plaintiffs' aiding and abetting claim because this alleged "assistance" by Chase occurred after the alleged primary tort had already occurred. See Premier Funding Group LLC v. Aviva Life and Annuity Co., Case No. CV–14–01633–PHX–

---

[41]Id. at 8-9, ¶¶ 48-56.

[42]Id. at 14, ¶ 86.

DGC, 2014 WL 6885732, at *11 (D. Ariz. Dec. 8, 2014) (citation omitted) ("Aviva's alleged decision to ratify and conceal Baldwin's fraud after it occurred cannot be a substantial factor in causing the resulting tort"). Chase reminds plaintiffs that they have to show that Chase provided substantial assistance to the commission of the primary tort, which here, according to Chase, was the fraudulent conversion of plaintiffs' down payment for the Arizona real estate. Chase argues that this alleged tort was complete once KeyBank wired the money from plaintiffs' account to the Chase account.

The problem with Chase's substantial assistance argument is that the primary tort was not necessarily complete once KeyBank wired the money from plaintiffs' account to the Chase account. Plaintiffs' aiding and abetting claim is based on what Chase did after the funds were transferred. Plaintiffs have plausibly alleged that Chase substantially assisted with the primary tort because plaintiffs have alleged that Chase released the funds to the fraudsters even though Chase knew about the alleged fraud. Plaintiffs have stated a plausible aiding and abetting claim against Chase.

Next, Chase argues that plaintiffs have not stated a plausible ACFA claim. "The ACFA prohibits any 'deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely . . . in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled.'" Rich v. BAC Home Loans Servicing LP, Case No. CV–11–00511–PHX–SRB, 2013 WL 10104612, at *3 (D. Ariz. Dec. 13, 2013) (quoting A.R.S. § 44–1522)). "'To succeed on a claim of consumer fraud, a

plaintiff must show a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and consequent and proximate injury resulting from the promise.'" Id. (quoting Kuehn v. Stanley, 91 P.3d 346, 351 (Ariz. Ct. App. 2004)). "'An injury occurs when a consumer relies, even unreasonably, on false or misrepresented information.'" Id. (quoting Kuehn, 91 P.3d at 351).

Chase argues that plaintiffs' ACFA claim is not plausible because the alleged fraudulent acts did not occur in Arizona. The ACFA "applies to acts committed within Arizona in violation of its provisions." State ex rel. Corbin v. Goodrich, 726 P.2d 215, 221 (Ariz. Ct. App. 1986). "Victims need not be Arizona residents in order for the state to enforce its statutes against a person or persons conducting business within the state." Id. But, Chase argues that in order for plaintiffs to bring an ACFA claim, that claim must be based on misconduct committed in Arizona. Here, plaintiffs allege that Chase violated the ACFA by releasing the funds, continuing to do business with the fraudsters, concealing the alleged fraud, failing to stop the alleged fraud, failing to notify plaintiffs "of their ability to take action to stop the transaction", failing to obtain an FBI "kill chain order", and failing to protect plaintiffs from the "known fraud."[43] Chase argues that none of this conduct is alleged to have occurred in Arizona. Rather, Chase argues that this conduct occurred in Washington state, where plaintiffs live, or in Texas, where the Chase bank account the funds were transferred to was located.

---

[43]First Amended Complaint at 18, ¶ 116, Docket No. 10.

Plaintiffs suggest that Chase is attempting to raise a personal jurisdictional argument here, an argument that would surely fail, according to plaintiffs. But, that is not what Chase is arguing here. Chase is arguing is that in order for plaintiffs to have a plausible ACFA claim, the fraudulent acts in question must have occurred in Arizona.

As to that argument, plaintiffs cite to <u>Vanguard Specialized Funds v. VEREIT Inc.</u>, Case No. CV-15-02157-PHX-ROS, 2016 WL 5858735 (D. Ariz. Oct. 3, 2016). There, the plaintiffs alleged that the defendants had violated the ACFA in connection with their purchase of ARCP stock. <u>Id.</u> at *1-2. The defendants sought to dismiss the plaintiffs' ACFA claims because the "[p]laintiffs ha[d] not pled a sufficient connection to Arizona[.]" <u>Id.</u> at *7. The court rejected this argument, in large part, because the "[p]laintiffs allege that [ARCP had] an office employing over 2,000 people in Arizona, and that some of their investors who suffered from the alleged fraud are Arizona residents." <u>Id.</u> at *11.

Similarly here, plaintiffs argue that Chase has an office in Phoenix and 20 branch locations in Phoenix. They also argue that there is a sufficient connection to Arizona because the real estate that they were attempting to purchase was located in Arizona. Plaintiffs argue that Chase is asking the court to find that even though Chase inserted itself into a financial transaction for the sale of real estate in Arizona, this case has no nexus to Arizona. Plaintiffs contend that this is a nonsensical argument.

While this case may have some nexus to Arizona, the ACFA only applies to acts committed in Arizona that violate the Act. Plaintiffs have not alleged any conduct that Chase committed in Arizona. The fact that the real estate that plaintiffs were attempting to purchase

was in Arizona does not change anything. As Chase points out, its involvement in this case would have been the same regardless of what state the real estate was located in. As for Chase's presence in Arizona, plaintiffs have not alleged that any of the Chase branches in Arizona were involved in the events at issue in this case. Plaintiffs' ACFA claim is implausible because plaintiffs have not alleged, nor could they allege, that any of Chase's violations of the Act occurred in Arizona.

## Conclusion

Chase's motion to dismiss[44] plaintiffs' first amended complaint is granted in part and denied in part. The motion is granted as to plaintiffs' EFTA and ACFA claims against Chase. These claims are dismissed with prejudice as amendment would be futile. The motion is denied as to plaintiffs' aiding and abetting claim.

DATED at Anchorage, Alaska, this 5th day of February, 2019.

/s/ H. Russel Holland
United States District Judge

---

[44]Docket No. 27.